[No. B089056. Second Dist., Div. Seven. Feb. 20, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS JEFFERY RICCIO, Defendant and Appellant.

**COUNSEL**

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—A jury convicted appellant of receiving stolen property (Pen. Code, § 496, subd. (a); statutory references, unless otherwise noted, are to the Penal Code) and found true an "on bail" allegation (§ 12022.1).[1] He was sentenced to a high, three-year prison term and ordered to pay the victim $165,000 restitution.

Appellant contends the trial court violated the corpus delicti rule by admitting his extrajudicial statements and erred in imposing $165,000 restitution. We affirm.

### FACTUAL BACKGROUND

There being no insufficiency of evidence claim, the facts may be stated briefly. Our perspective favors the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

The victim, Arthur Smith, was a second generation numismatist. In 1976 he bought his father's Miami business, changed the name to Smith & Daughter, and specialized in rare Latin American coins. He was among the country's five major dealers in this coin specialty.

In early February 1993 Mr. Smith attended a coin show at the Long Beach Convention Center where he rented a booth and displayed more than 1,200 Latin American coins worth approximately $500,000. Collectively, the coins were unique. As displayed, each coin had its own circle or disk, a cardboard square listing its date, nationality, denomination, and a cost code.

Mr. Smith had also brought dies and hubs. A die is the striking device which makes a coin and a hub is the device which makes the die.

In preparation for his end-of-show departure, Mr. Smith disassembled the display and put each coin in a "flip," a distinctive two-inch by four-inch double-pocket vinyl envelope with sewn edges. Each flip had a coin in one pocket and a card in the other. On one side of the card was the business logo, a sketch of Mr. Smith's father's face. At the bottom was imprinted: Sidney W. Smith, 2510 Biscayne Blvd., Miami, Florida. OLD COINS AND ANTIQUES. On the other side was a description of the coin and a cost and price code.

---

[1] The jury could not agree on "the loss exceeds $150,000" allegation (§ 12022.6, subd. (b)). Two prior felony convictions were alleged (a 1988 escape and a 1984 federal possession of goods stolen in interstate shipment) but, because appellant had remained free of custody for five years, no proof was offered.

The coins, in their flips, were placed in custom red velvet trays and the trays put in special brief cases. Also in one of the briefcases was a computer-printed inventory of all the gold coins Mr. Smith had brought to the show. In the upper corner of the first page was Mr. Smith's business name and address.

On Sunday, at show's end, Mr. Smith went to his locked booth to recover his briefcases. Two were missing. They contained all the coins he had brought to the show. Also missing was a flight bag containing display supplies.[2]

Mr. Smith immediately notified the Long Beach Police Department of the theft and distributed descriptive brochures of the stolen coins to dealers throughout the United States. The F.B.I. participated in the investigation.

Sometime thereafter some of Mr. Smith's stolen coins were sold at coin shows in Dallas and in Omaha and to a coin dealer in Oklahoma City.

In March 1994 appellant went to the Rare Coin Galleries of Glendale with approximately 100 of Mr. Smith's stolen coins. He told the proprietor, Robert Van Beeber, his name was Tom, that he was a baseball card dealer, and that, for a client, he was selling a world class coin collection. Mr. Van Beeber looked at the gold coins, each in a double-pocket flip with one pocket empty. Appellant did not provide any coin list or identifying information to Mr. Van Beeber but appellant seemed to know which coins were the most valuable. Mr. Van Beeber bought approximately 20 coins and, at appellant's request, paid him in Krugerrands, about $3,000 to $4,000.

Appellant did not tell Mr. Van Beeber his last name, the name of his baseball card business, or his phone number.

About two weeks later appellant returned with some of Mr. Smith's stolen silver coins. Mr. Van Beeber bought about 10 to 15 and paid appellant about $2,000, again, at appellant's request, in Krugerrands.

On May 9, 1994, appellant went to Mr. Van Beeber's store for the third time. He brought 68 coins, each in a flip without identifying description. He said he would leave the coins, let Mr. Van Beeber decide which he would buy at what price, and return in about an hour and a half. Appellant then left.

Mr. Van Beeber looked at the coins and noticed several exceedingly rare ones including an 1870 Cuban half peso struck in copper. He then remembered that Latin American coins had been stolen from his friend Arthur

---

[2]A briefcase containing about $3,000 cash and some coins Mr. Smith had bought at the show was not stolen.

Smith a year ago and called Mr. Smith. Mr. Smith telephoned the F.B.I. and the police.

Glendale Police Sergeant Bruce went to Mr. Van Beeber's store, posed as a customer, and awaited appellant's return.

Appellant telephoned Mr. Van Beeber about the coins but Mr. Van Beeber said he had not finished looking at them. Appellant called again and Mr. Van Beeber quoted some prices he would pay. Sometime later appellant returned and Mr. Van Beeber gave him a list of the coins he would buy at indicated prices. Appellant took the list to a table, studied them, and then told Mr. Van Beeber he would have to leave and contact his client about the prices.

When appellant exited, two Glendale police detectives blocked his path and showed appellant their badges. Appellant turned away from them but was confronted by Sergeant Bruce who told him he was under arrest. Appellant said, "You can't prove they are stolen."

Sergeant Bruce removed car keys from appellant's pocket and appellant said he did not have a car with him. Sergeant Bruce told his detectives to search the area for appellant's car. They found it parked a couple of blocks away.

Appellant was brought to the police station and interviewed. He was very nervous, talked rapidly, and stuttered.

Although the officers had learned appellant's home address, apparently by identifying his car, they asked him what it was and initially appellant refused to tell them.

Concerning the coins he had sold and tried to sell to Mr. Van Beeber, appellant said he bought them about six months ago from a male, White, at his baseball card business for $4,500. This person drove an old car and appellant did not know his name, first or last. Appellant said he did not *know* the coins were stolen, thought they probably were stolen, and did *not* ask because he did not want to know.

Later, appellant told the officers where he lived and accompanied them to his house. He opened his two safes and inside the officers recovered approximately 1,100 coins stolen from Mr. Smith. Each was in its original flip with an accompanying card but each card—except one—had been torn in half. Only the logo half, not the company name and address, was present. One flip still had an untorn card complete with Mr. Smith's business name

and address. Also in the safe was Mr. Smith's computer inventory of gold coins. The upper corner—where his business name and address had been—was torn off. Additionally, the police recovered from appellant's house approximately 300 of Mr. Smith's display "circles" or disks and the stolen dies and hubs.

Appellant admitted to the officers he had sold some of the coins in Dallas, Omaha, and Oklahoma City.

Appellant did not testify.

## DISCUSSION

1. *Appellant contends the trial court violated the corpus delicti rule by admitting his extrajudicial statements.*

■ "The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. . . . 'The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause.' . . . Such proof, however, may be circumstantial and need only be a slight or prima facie showing 'permitting the reasonable inference that a crime was committed.'" (*People* v. *Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009], internal citations omitted.)

Appellant cites no cases where the "slight proof" required to establish a corpus delicti has been found wanting. Such cases are rare.

In *Jennings*, for example, the corpus delicti of robbery was established by proof that a purse belonging to Olga Cannon was found in defendant's car; defendant behaved "suspiciously" when another woman asked if she could have the purse; Olga Cannon's nude, decomposed body had been found in an irrigation ditch and she had a fractured jaw. *Jennings* stated: "These facts satisfy the corpus delicti rule as to the Cannon robbery." (*People* v. *Jennings*, *supra*, 53 Cal.3d 334, 365.)

The proof that Olga Cannon had been *raped* was, concededly, "thin" but found sufficient for purposes of corpus delicti. It consisted only of her naked, abandoned, badly decomposed body. *Jennings* stated: "When the body of a young woman is found unclothed in a remote locale, an inference arises that some sexual activity occurred, thus satisfying the requirement that there be some showing of a loss, injury, or harm." (53 Cal.3d at p. 367.)

For corpus delicti purposes, *Jennings* makes clear, the evidence need only create *a reasonable inference*—"by no means the only, or even the most

compelling [inference]"—that the crime has occurred. (53 Cal.3d at p. 367; see also *People* v. *Jacobson* (1965) 63 Cal.2d 319, 326-327 [46 Cal.Rptr. 515, 405 P.2d 555] [21-month-old child found "drowned" in bathtub]; *People* v. *Martinez* (1994) 26 Cal.App.4th 1098, 1105 [31 Cal.Rptr.2d 869] [robbery]; *In re Robert P.* (1981) 121 Cal.App.3d 36, 38-40 [175 Cal.Rptr. 252] [petty theft, receiving stolen property, and auto tampering]; *People* v. *Wheeldin* (1969) 276 Cal.App.2d 744, 748-749 [81 Cal.Rptr. 270] [receiving stolen property]; *People* v. *Barnes* (1962) 210 Cal.App.2d 740, 746 [26 Cal.Rptr. 793] [receiving stolen property].)

■ Appellant does not contest two of the three corpus delicti elements: that property had been stolen and that he received the stolen property. His claim concerns only the third element, *knowledge* the property was stolen.

We are satisfied a *reasonable inference* of such knowledge was proved by the following evidence: (1) appellant possessed a unique collection of recently stolen rare coins worth approximately $500,000; (2) appellant had no purchase documents; (3) appellant told Mr. Van Beeber he had a world class collection of coins to sell but did not disclose his last name, business address, or a phone number[3]; (4) the coins appellant offered to Mr. Van Beeber were all in flips without cards but the coins in appellant's safe were all in flips with half-torn cards; (5) one coin in appellant's safe had a card with Mr. Smith's business name and address; (6) on May 9, 1994, appellant parked his car several blocks from Mr. Van Beeber's store; (7) appellant falsely stated he had no car with him on May 9, 1994[4]; (8) appellant possessed approximately 300 cardboard circles or disks used by Mr. Smith when displaying coins; and (9) appellant possessed Mr. Smith's computer inventory of gold coins (but did not show it to Mr. Van Beeber)—and Mr. Smith's business name and address had been torn off.[5]

2. *Appellant contends the trial court erred in imposing $165,000 restitution.*

Pursuant to Government Code section 13967, subdivision (c)[6] the trial court ordered appellant to pay $165,000 restitution.

---

[3]Defense counsel elicited this evidence.

[4]No corpus delicti objection was made to this statement.

[5]We need not consider whether or not the corpus delicti rule has been abrogated by article I, section 28, subdivision (d) of the California Constitution. (See *People* v. *Culton* (1992) 11 Cal.App.4th 363, 373-377 [14 Cal.Rptr.2d 189] (conc. opn. of Timlin, J.).)

[6]The former subdivision provided:

"(c) In cases in which a victim has suffered economic loss as a result of the defendant's criminal conduct, and the defendant is denied probation, in lieu of imposing all or a portion of the restitution fine, the court shall order restitution to be paid to the victim. If a defendant

■ Appellant contends he was denied "the right to a hearing . . . . to dispute . . . . the amount of restitution." (Gov. Code, § 13967, former subd. (c).) Appellant is mistaken.

On September 14, 1994, at the probation and sentence hearing, the trial court stated it was going to order restitution but would defer setting the amount until it received a supplemental report from the Department of Corrections. The trial court informed appellant and his counsel that the report would be available by September 28, defense counsel could "look at it and see if you want to have a hearing on their conclusions . . . ." The trial court stated if defense counsel requested a hearing, one would be set "some time after the 28th." Defense counsel agreed to this procedure and appellant personally waived his presence at the hearing, if any.

On September 28, 1994, defense counsel stated: "I talked to my client yesterday and he withdrew the authority for me to talk about this or discuss it."

The trial court stated it was setting the restitution amount at $165,000[7] and defense counsel asked to continue the restitution hearing until October 16. The trial court denied the motion without prejudice, allowing defense counsel to renew his "motion to see if the Court's willing to hear anything additional on it in the way of evidence or hearing." The record on appeal discloses no "renewed" motion by defense counsel.

---

has been convicted of a felony violation of Section 288 of the Penal Code, restitution to the victim may be ordered whether or not the defendant is denied probation. Notwithstanding subdivision (a), restitution shall be imposed in the amount of the losses, as determined. The court shall order full restitution unless it finds clear and compelling reasons for not doing so, and states them on the record. A restitution order imposed pursuant to this subdivision shall identify the losses to which it pertains, and shall be enforceable as a civil judgment. The making of a restitution order pursuant to this subdivision shall not affect the right of a victim to recovery from the Restitution Fund in the manner provided elsewhere, except to the extent that restitution is actually collected pursuant to the order. Restitution collected pursuant to this subdivision shall be credited to any other judgments for the same losses obtained by the victim against the defendant arising out of the crime for which the defendant was convicted.

"Restitution ordered pursuant to this subdivision shall, to the extent possible, be of a dollar amount that is sufficient to fully reimburse the victim, or victims, for all determined economic losses incurred as the result of the defendant's criminal conduct. If the conviction is for felony violation of Section 288 of the Penal Code, the court may also order that the restitution be paid to the victim to cover noneconomic losses, including, but not limited to, psychological harm.

"For any order of restitution made pursuant to this subdivision, the defendant shall have the right to a hearing before the judge to dispute the determination made regarding the amount of restitution."

[7]The record on appeal does not include a supplemental report from the Department of Corrections and no reference to it was made on September 28.

As this chronology demonstrates, appellant was afforded his right to a hearing but chose not to request one.

Appellant's attempt, on September 28, to withdraw authority from his attorney to "discuss" restitution was a nullity. A "defendant represented by counsel cannot . . . dictate what motions counsel will bring on his behalf; . . . counsel has authority to control court proceedings." (*People* v. *Crandell* (1988) 46 Cal.3d 833, 860 [251 Cal.Rptr. 227, 760 P.2d 423].)

Appellant offered no evidence of the appropriate restitution amount, did not request, after September 28, a restitution hearing, and did not object to the restitution order. It is too late, now, to complain. (*People* v. *Gibson* (1994) 27 Cal.App.4th 1466 [33 Cal.Rptr.2d 217]; *People* v. *Menius* (1994) 25 Cal.App.4th 1290, 1297-1299 [31 Cal.Rptr.2d 15]; *People* v. *Le* (1995) 39 Cal.App.4th 1518 [46 Cal.Rptr.2d 566].)

## DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.